**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **V.** | : | **CRIMINAL NUMBER 25-042-1** |
| | : | |
| | : | |
| **SAAHIR IRBY** | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

Saahir Irby, by his counsel undersigned, Jesse Smith, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, submits this memorandum in aid of sentencing. As discussed in more detail in the Government's Change of Plea Memorandum and the Presentence Report (PSR), between November 2022 and September 2024, Mr. Irby, in his capacity as a mail processing clerk at the United States Postal Service (USPS) Philadelphia Processing and Distribution Center, conspired with his three co-defendants to steal treasury checks in exchange for payment. This conspiracy resulted in an "actual" loss amount of approximately $11,055,414.25, with Mr. Irby receiving approximately $72,510.00 for his participation.

Mr. Irby was ultimately charged with conspiracy to steal government funds, in violation of 18 U.S.C § 371 [Count One]; theft of government funds and aiding and abetting, in violation of 18 U.S.C. §§ 641 and 2 [Count Two]; mail theft and aiding and abetting, in violation of 18 U.S.C. §§ 1708 and 2 [Count Three]; and mail theft, in violation of 18 U.S.C. § 1708 [Count Four]. Pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), he accepted responsibility for his offense and pled guilty via plea agreement to all Four Counts of the Indictment on May 5, 2026, before the Honorable Joshua D. Wolson.

In light of the totality of the circumstances—including Mr. Irby's full acceptance of responsibility, the nonviolent nature of the offense, his substantial restitution obligations, and his history and characteristics, particularly his severe gambling addiction—the defense respectfully requests a sentence of 63 months' imprisonment, at the bottom of the advisory Guidelines range. Such a sentence would account for the mitigating circumstances detailed in this memorandum and be sufficient, but not greater than necessary, to achieve the sentencing objectives of 18 U.S.C. § 3553(a).

The defense has no substantive objections to the Presentence Investigation Report (PSR), as revised on October 9, 2026. The PSR sets forth the advisory guideline range in this case. The total offense level is 26, criminal history category I with a range of 63 to 78 months' incarceration.

Between 2022 and 2024, when the offense occurred, Mr. Irby was struggling with a severe gambling addiction. Faced with mounting gambling debts and a persistent compulsion to continue gambling, he became increasingly desperate for money. Although he initially rejected his cousin's proposal to participate in the theft, he ultimately agreed, viewing it as a means to obtain money to sustain his gambling. His addiction provides important context for that decision, but he recognizes that he remains responsible for his conduct and its consequences.

In preparing for sentencing, Mr. Irby has repeatedly expressed remorse and reflected on the decisions that led to his involvement in the conspiracy. The consequences have been substantial: he faces imprisonment, has lost his job, and will confront the employment barriers associated with a federal conviction. His significant restitution obligations will also burden him for years to come. He has given serious thought to how his gambling contributed to his conduct and to the changes he must make to avoid repeating those decisions.

He began regularly engaging in therapy, and upon the advice of Dr. Lia Nower, J.D., Ph.D., he plans on attending gambling counseling while serving his sentence and upon his release. The defense retained Dr. Nower to evaluate and explore Mr. Irby's gambling addiction. Her report detailing her findings is attached as Exhibit A to Defendant's Supplemental Sentencing Memorandum. Exhibit B attached hereto is Dr. Nower's curriculum vitae.

Mr. Irby's struggles at the time of the offense are not offered as an excuse. He accepts full responsibility for his actions. They are, however, relevant context for the Court's consideration of the circumstances surrounding the offense and what the future as a law-abiding individual looks like. He recognizes that the consequences of his actions will profoundly affect his own life and, of greater concern to him, the life of his son. Mr. Irby is adamant he would respond differently if confronted with similar hardships in the future.

## I. <u>MR. IRBY'S PERSONAL HISTORY</u>

Saahir Irby is 28 years old. He was born in Philadelphia, Pennsylvania to Grashon Allen (age unknown) and Nafessah Irby (48) as their only child. Although his father was absent from his life throughout his childhood, he was still raised with love in the household. Although they lived in a neighborhood rife with gun violence and drug use, his mother worked hard as a licensed social worker to provide all the necessities for Mr. Irby. When he was five years old, his mother married Derek Scott (50s), a truck driver, who stepped up as a father figure in Mr. Irby's life—a relationship that has endured well into adulthood, despite Mr. Scott's separation from Mr. Irby's mother.

Although Mr. Irby recalls a happy childhood, he was also exposed to violence and made a deliberate effort to distance himself from influences that threatened to draw him into it. He would keep himself busy with sports, work, and after-school activities, such as baseball. Indeed,

Mr. Irby developed a meaningful connection to his baseball coach, William Arrowood, who would remain in Mr. Irby's life as a mentor. Mr. Arrowood provided a character letter, attached as Exhibit C, wherein he describes the neighborhood where Mr. Irby grew up. In his words, "[w]hile many of his peers were caught up in illegal behavior, and more than a few were killed in related incidents, Saahir tried to remain above the fray, getting a steady job, moving out of the neighborhood to avoid the casualty from the risks and perils found in public housing." Indeed, there were two instances in which Mr. Irby, a mere bystander at ages 13 and 15, was in the path of gunfire and nearly shot. At a young age, he was forced to witness his friend get shot. Luckily, his friend survived, but the trauma of these experiences still stuck with Mr. Irby.

Mr. Irby's family and community describe a strong work ethic that took root in childhood. In addition to Mr. Arrowood, several loved ones wrote letters of support: his cousin Myeesha Powell (attached as Exhibit D), his mother Nafeessah Irby (attached as Exhibit E), his grandmother Barbara Irby (attached as Exhibit F), and his partner and son's mother, Kiara Brown (attached as Exhibit G). Mr. Arrowood recalled that, even as a child, Mr. Irby was a "leader among his peers [who] developed a strong work ethic, working at the playground and adjacent park to improve the quality of life of his community." His mother discussed how he began working at the age of 13, doing summer jobs, and how he maintained consistent employment from age 16 to the present. *See* Nafeesah Irby Letter at 1. This character trait was echoed in all of the submitted letters of support. *See* Barbara Irby Letter ("I have known him through all stages of his life and witnessed his consistent work ethic[.]"); *see also* Myeesha Powell Letter ("He is personable, hardworking, and deeply connected to the people he cares about[.]").

After graduating high school—and attending some college—Mr. Irby maintained steady employment throughout much of his adult life. Prior to the underlying offense, Mr. Irby worked in transportation as a transport driver with Enterprise Rent-A-Car in Philadelphia. Prior to this, he was, *inter alia*, a treatment assistant at Volunteers of America halfway house, a "houseman" at a hotel, and a package handler with UPS. Although he is currently unemployed, Mr. Irby has worked diligently since he was let go from USPS in September of 2024 due to the underlying case. His occupations have included being a full-time fueler at the Philadelphia International Airport, a paratransit driver with Be Safe Transport, and a prospective (he trained for several months, but was ultimately placed on a waitlist and withdrew to find active employment) bus driver with Easton Coach Company in Philadelphia. Mr. Irby also worked with Scratch Distribution in Haddonfield, New Jersey, and Lightspeed Logistics in Hilltown, Pennsylvania. The times in between his active employment were generally spent seeking employment, and he ultimately only needed governmental financial assistance for three months. Mr. Irby is now actively seeking employment at J&J Staffing Resources. His strong work history and ongoing search for employment reflect his commitment to contribute to providing for his family, especially for his three-year-old son.

Mr. Irby's son is the center of his world. Although his son lives with his mother and they have no formal custody or child support arrangement, he provides for his son's needs and spends time with him on weekends. He and his partner, Ms. Brown, enjoy a healthy co-parenting relationship. In her letter to the Court, she described his role in their son's life:

> [S]aahir is an extremely involved father. When it comes to [our son], he does not miss a beat. He is involved with his daycare, doctors' appointments, and the most important milestones in our son's life. He has been there for his first steps, his first words, and so many other moments that I know we will always remember.

Kiara Brown Letter at 1.

Mr. Irby treasures the weekends with his son, and is devastated by the prospect of losing irreplaceable years of his son's childhood to incarceration. During these formative years of his son's childhood, those years represent moments and milestones Mr. Irby will never have another opportunity to share. Mr. Irby takes comfort in knowing that his family and his son's mother will take good care of his son in his absence, but that reassurance does not ease the pain of knowing he will be unable to be present as the father he wants to be. Depending on the Court's sentence, Mr. Irby's son could be nine years old by the time he is released. He is determined to break the cycle of paternal absence that marked his own childhood, yet Mr. Irby recognizes that his actions will now prevent him from being present for an important portion of his son's life. His desire to be a consistent presence in his son's life strengthens his resolve to address the gambling addiction that contributed significantly to his criminal conduct.

What began as casual online sports betting gradually escalated into compulsive gambling that consumed his income and increasingly dominated his life. Initially, he would spend merely $50 on sports bets twice per week and occasionally played cards with friends. However, his gambling intensified significantly during the COVID-19 pandemic, including an occasion when he gambled away his entire stimulus check. Describing the extent of his spending, he explained, "I couldn't say how much I was spending but it was about 80% of my paycheck." Dr. Nower at 5. By 2022, he was gambling daily across multiple online sports betting platforms. He later began playing baccarat on live machines and became increasingly preoccupied with high-risk side bets. His gambling progressed to higher-stakes games at several Philadelphia-area casinos, exhausting his financial resources. On one occasion, he remained at a casino for 36 consecutive hours. As he told Dr. Nower, "It wasn't for the game at this point, it was for the side bets." *Id.* As his losses mounted, his compulsion to continue gambling persisted. He reported that, after

repeatedly refusing to participate in the theft, he ultimately agreed to obtain money to continue gambling. *Id.*

Notwithstanding these hardships, Mr. Irby has taken meaningful and sustained steps toward self-improvement. He has engaged in therapy and, as documented in the PSR and confirmed by his Pretrial Services officer, has complied with all court-ordered conditions of release without incident and tested negative for substances for all 22 of his urinalysis tests. PSR ¶ 13, 14. He plans to build on this progress by pursuing treatment specifically directed at his gambling addiction. Although currently unemployed, as evidenced above by his character letters and employment records, Mr. Irby has also demonstrated that commitment through consistent, lawful employment. Looking forward, Mr. Irby is considering earning his Commercial Driver's License, further underscoring his commitment to building a productive and law-abiding future.

Mr. Irby accepts full responsibility for his conduct in this case. He understands that his own decisions brought him before this Court and will result in the loss of his liberty. This experience has compelled him to confront the choices that led him here and to commit himself to meaningful change.

## II. APPLICATION OF THE SENTENCING GUIDELINES

As indicated in the PSR, the advisory sentencing guideline range is 63 to 78 months' incarceration. PSR ¶ 104. The defense respectfully submits that a sentence at the bottom of this range is warranted considering his lack of criminal history, struggles with addiction, family and community support, strong work history, and full compliance while on pretrial release.

### A. Mr. Irby's Struggles with Gambling Addiction Support a Sentence at the Bottom of the Guidelines.

The record demonstrates that Mr. Irby's offense conduct cannot be understood in isolation from the severe and untreated gambling disorder that had taken hold of his life. As Mr.

Irby himself explained, his thinking at the time was not rational or calculated, but distorted by addiction. In his words, "I was spending most of my check[.] I would work, get my check, and go right to the casino." Dr. Nower at 5. That distorted thinking quickly led to a loss of control. Mr. Irby estimates that he would gamble approximately $1,000 every week, eventually mounting losses so great that he lost his car. This detachment from rational thinking—common in severe gambling disorder—underscores that Mr. Irby was not engaging in careful, profit-driven decision-making, but rather acting under the compulsive and disordered thinking characteristic of addiction.

Dr. Nower's clinical findings provide important context for why gambling became so consuming for Mr. Irby. To assess the severity of Mr. Irby's condition, Dr. Nower administered three validated measurement instruments. The first is *The Problem Gambling Severity Index*; in describing this instrument and its results, Dr. Nower wrote that "a score of 8+ indicates probable gambling disorder; Mr. Irby scored 16, indicating a very serious gambling problem, likely leading to negative consequences and loss of control . . . [suggesting a seriousness] relative not only to the clinical population [domestically, but also to] individuals in the general population internationally." *Id* at 5-6. The second instrument is *The Diagnostic and Statistical Manual of Mental Diseases*. In considering the results, Dr. Nower stated that "Mr. Irby's gambling behavior met criteria for Gambling Disorder, persistent and severe" after endorsing eight criteria at the time of the events leading up to the offense, where only four or more criteria are required for a positive diagnosis. *Id.* at 6. Finally, in applying *The Gambling Pathway's Questionnaire*, Dr. Nower described that his pathway to gambling addiction is the "behaviorally conditioned" pathway, "characterized by an absence of psychopathology before gambling became a problem." *Id.* She described those with this pathway as "having gambling problems develop mainly through

exposure to gambling, which becomes a habit that is reinforced through intermittent wins which, in turn, fuel cognitive distortions about the odds of winning." *Id.*

Dr. Nower further explained the direct relationship between this disorder and the offense conduct:

> He indicated that, had his gambling not overwhelmed his life, he would have continued to resist the invitation to engage in the activities that led to these charges. Initially, Mr. Irby said he refused to participate in the theft but, as his gambling debts mounted and he saw no way to find the money to continue gambling, he reluctantly agreed . . . He said he underestimated the strength of his addiction and its ability to cloud his judgment in a way that he had never experienced before.
>
> Dr. Nower at 7.

Mr. Irby's offenses were serious, and he does not minimize that fact. He accepts full responsibility for this offense. Nonetheless, in determining a sentence that is "sufficient, but not greater than necessary" under 18 U.S.C. § 3553(a), the Court should consider the extent to which untreated and severe addiction drove the conduct at issue.

## III. APPLICATION OF THE STATUTORY FACTORS TO THIS CASE

### A. The § 3553(a) Factors Independently Support a Sentence at the Bottom of the Sentencing Guidelines.

Consideration of the statutory factors outlined in 18 U.S.C. § 3553(a), as well as *United States v. Booker*, 543 U.S. 220 (2005) and numerous cases since then, support a guideline sentence of 63 months' incarceration separate and apart from the Court's consideration of Mr. Irby's gambling addiction.

Regarding Mr. Irby's history and characteristics, as detailed above, they provide important context for the offense conduct, reflecting a severe gambling disorder. However, they also show that he has no prior criminal history, he has a strong work history, and a dedicated community willing to support him. Mr. Irby also abided by all of the rules and conditions of his

supervision—Mr. Irby remained employed, reported as directed, maintained communication with Pretrial Services, and incurred no new criminal charges. *See* PSR ¶ 13, 14. His overall performance on release demonstrates his ability to comply with structured supervision and supports a sentence at the bottom of the guidelines range, followed by supervision that addresses his gambling addiction.

Notably, this offense concluded in 2022—in the two years that have passed since, Mr. Irby has been law-abiding and employed or actively searching for employment. Despite being in arguably worse financial straits following his termination at the USPS, Mr. Irby made no attempt to attain money by any other illegal means. This is evidence that Mr. Irby learned from his poor decision making. Furthermore, the government confronted Mr. Irby with charges several years ago, prior to the official indictment. He made no effort to flee or avoid prosecution. In fact, Mr. Irby immediately accepted responsibility for his actions. Following his September 2024 arrest, when confronted by special agents from various law enforcement agencies, Mr. Irby waived his right to counsel and confessed to his involvement. Mr. Irby's history, considered in full, shows a hard-working man with a gambling addiction who made a serious mistake, but has a demonstrated capacity for growth and law-abidingness.

Regarding the nature and circumstances of the offense, the offense was non-violent. It arose in the context of Mr. Irby's severe and untreated gambling addiction. His actions were not motivated by a desire for luxury or personal enrichment—Mr. Irby did not use the funds to purchase cars, homes, or other assets; indeed, Mr. Irby *lost* his car due to his gambling. Instead, consistent with the compulsive nature of his addiction, he lost the funds through gambling activity. Again, while his addiction does not excuse the offense, it provides important context for

understanding both its nature and the absence of traditional markers of profit-driven criminal conduct.

Mr. Irby is now faced with spending significant time in a federal prison. He recognizes how the loss of his liberty, the ability to see his son, the inability to work, and the stress these events have had on him are all consequences of his own actions. Indeed, the federal prosecution in this matter has already imposed significant consequences on Mr. Irby. Due to the underlying case, he developed symptoms of depression that have persisted throughout the time that has passed since he was first confronted. He was later be diagnosed with adjustment disorder with mixed anxiety and depressed mood, for which he is still receiving treatment. Apart from the mental toll the prosecution has taken, he will now carry the lasting consequences of a felony conviction, including diminished employment prospects and the enduring stigma associated with a federal offense. He understands this conviction will follow him for the rest of his life and regards it as a profound source of shame.

Similarly, Mr. Irby's prosecution and conviction for this case in the serious venue of federal court, along with serving a significant prison term, provides a more-than-adequate general deterrent to other, similarly situated individuals. Even if he were to receive a sentence at the bottom of the guidelines, Mr. Irby would not be escaping punishment. Moreover, it is well-established that the *certainty* of punishment, not the *severity* of it, has the most significant general deterrent effect. *See*, *e.g.*, CESARE BECCARIA, ON CRIMES AND PUNISHMENTS AND OTHER WRITINGS 63 (Richard Bellamy, ed.; Richard Davis, trans., Cambridge University Press 1995) (1764); Frank H. Easterbrook, *Criminal Procedure as a Market System*, 12 LEGAL STUD. 289, 295 & n.7 (1983); Alfred Blumstein, *Prison*, *in* CRIME 387, 408-409 (Wilson & Petersilia, eds., 1995); Daniel S. Nagin & Greg Pogarsky, *Integrating Celerity, Impulsivity, and Extralegal*

*Sanction Threats into a Model of General Deterrence: Theory and Evidence*, 39 CRIMINOLOGY 865 (2001); Josiah Tonry, *The Functions of Sentencing and Sentencing Reform*, 58 STAN. L. REV. 37, 52-54 (2005); Raymond Paternoster, *How Much do we Really Know about Criminal Deterrence*, 100 J. CRIM. L. & CRIMINOLOGY 765, 818 (2010) ("The safest conclusion from the literature thus far would be that the perception of certain legal and extralegal sanctions does seem to act as a modest deterrence factor, but that the perceived severity and celerity of punishment do not appear to be effective deterrents to crime, and we know virtually nothing about celerity"). Therefore, even a sentence at the bottom of the guidelines would send an appropriate message to others and deter people from committing similar crimes.

Regarding the protection of the public from further crimes, through Mr. Irby's lack of any criminal history and his compliance with the conditions of his pretrial supervision, he has proven that he is not a danger to the community. Furthermore, he is fully aware that he could receive much more time than his current exposure were he to recidivate; the risk of losing everything—especially time with his son—and the genuine change he has felt in himself are more than enough to protect the public from further crimes.

This federal conviction will continue to take a significant toll on his life, but it will also continue to be an opportunity for self-reflection and growth. Mr. Irby does not seek to justify or minimize his actions. He made a poor decision to commit a serious crime and one that he will pay dearly for. Consequently, a sentence at the bottom of the advisory guidelines range would fairly include this sentencing objective.

## IV. CONCLUSION

**WHEREFORE**, for the above reasons and any other reasons deemed just, the defense prays that the Court will grant the defendant's request for a guideline sentence of 63 months' imprisonment.

Respectfully submitted,

*/s/ Jesse Smith*
JESSE SMITH
Assistant Federal Defender

**CERTIFICATE OF SERVICE**

I, Jesse Smith, Assistant Federal Defender, Federal Community Defender Office for the Eastern District of Pennsylvania, hereby certify that I filed the attached Defendant's Memorandum in Aid of Sentencing via the Court's Electronic Filing (ECF) system, which sent notification to Jessica W. Rice, Assistant United States Attorney, 615 Chestnut Street, Suite 1250, Philadelphia, Pennsylvania, 19106.

*/s/ Jesse Smith*
JESSE SMITH
Assistant Federal Defender

DATE: October 9, 2026